# Staunton

MOYERS COAL CORPORATION v. F. K. WHITED, I. C. BOYD, ET AL.

September 17, 1931.

Present, Prentis, C. J., and Campbell, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Burns & Griffith* and *Richardson & Kemper*, for the appellant.

*B. T. Wilson*, for the appellees.

CAMPBELL, J., delivered the opinion of the court.

On the 1st day of February, 1927, the following contract in writing was entered into between J. S. Hall, agent or trustee for the stockholders of the Moyers Coal Corporation, and A. L. Israel and B. F. Pearman:

"This agreement made this 1st day of February, 1927, by and between J. S. Hall, acting as agent or trustee for H. B. Thompson, Mrs. J. H. Moyers, J. F. Willis, Virginia Kahle Willis, C. M. Rudder, Jr., George H. Crenshaw, W. R. Crenshaw, Amos Breeding and Mrs. Addie C. Hall, the stockholders of the stock of the Moyers Coal Corporation, party of the first part, and A. L. Israel and B. F. Pearman parties of the second part.

"Witnesseth: That the party of the first part, acting as

said agent or trustee, had this day agreed to sell all the outstanding stock of the Moyers Coal Corporation to the parties of the second part and the parties of the second part have agreed to purchase all of said stock, at the price and upon the conditions and terms hereinafter named, which are as follows: The price at which all of the one thousand (1,000) shares of said stock is sold is eleven thousand, five hundred ($11,500.00) dollars, of which one thousand ($1,000.00) dollars is cash in hand paid, the receipt whereof is hereby acknowledged, and the residue of the ten thousand, five hundred ($10,500.00) dollars is to be paid as follows: In fifty-three monthly installments, fifty-two of which are to be for the sum of two hundred ($200.00) dollars each and one, the last one, for the sum of one hundred ($100.00) dollars, said fifty-three payments above mentioned are represented by fifty-three non-interest bearing negotiable, collateral notes, of even date herewith, executed by said A. L. Israel and B. F. Pearman, parties of the second part, to the order of J. S. Hall, agent or trustee, payable at the Flat Top National Bank of Bluefield, West Virginia, which said notes are secured by the above mentioned stock, by the certificate of stock being attached to the above series of notes, and to be held by the said J. S. Hall, as such security.

"The conditions and agreements governing and regulating the above sale, and for the operation of the mine and property which is represented by the above mentioned stock are as follows:

"First, it is agreed by the parties hereto that the parties of the second part are to have the privilege of mining and shipping coal from or off the property of the Moyers Coal Corporation which is located at Drill, on Lewis creek, Russell county, Virginia, but only under the supervision and direction of a good and competent mine engineer. The parties of the second part agree to employ such an engineer

and to pay him for his services and to have him make a report to the said J. S. Hall of the condition of the mine, at least as often as sixty days, when the mine is being worked, at any time within each sixty-day period, and to supply the said J. S. Hall with a map of the mine as often as is necessary to keep him informed as to whether the mine is being worked in such a way as to protect the property in such manner as at all times to maintain the value of the property and thereby safeguard the security of the above mentioned notes and the interest of all concerned. It is understood and agreed that if the parties of the second part fail or refuse to follow the instructions of said mine engineer or the order of the State mine inspector, then the party of the first part at his option may stop the parties of the second part from mining and removing any coal until they comply with the requirements or else pay up all the remaining deferred payments. The party of the first part are to have the privilege of sending their own engineers out to the property at any time to make inspections of the same at their own expense, to make reports to both parties thereto as to the condition of the mine and as to whether it is being properly operated.

"Second, it is understood and agreed that the parties of the second part are to have the rights and privilege to use all the property of the Moyers Coal Corporation in any manner that they may see fit, but they are not to remove any timber, houses, or anything else other than coal from the property without express permission in writing from the party of the first part. It is understood however that the parties are to have the privilege to use all the timber that is necessary for the operation of the mine or mines located on the property of the Moyers Coal Corporation, such as ties, mine props and tipple timbers and the like.

"Third, it is agreed and understood that if at any time within the fifty-three months that there should be no market

for the coal from the mine, that the parties of the second part may be allowed to get as much as two notes past due, before any action can be taken by the party of the first part to sell collateral or to foreclose on these notes, it being the duty of the parties of the second part at all times to keep the party of the first part informed when they are shipping coal in order to get the benefits of this paragraph.

"Fourth, it is agreed and understood that the above mentioned notes may be paid off at any time before they are due and a discount is to be allowed in proportion to the time yet to run *bares* to the difference between $10,000.00 and $11,500.00.

"Fifth, it is understood and agreed that the parties of the second part are to pay all taxes and assessments on the property and to pay all State charges necessary to keep the charter of the corporation alive, and to make all State and national reports, so as to maintain the corporation intact and alive, while the stock is held as collateral. The parties of the second part are to have the right to control the corporation in every way only as above restricted, which restrictions are only for the protection of the security of the deferred payments above mentioned.

"Witness the following signatures and seals as of the day and year above mentioned.

"J. S. HALL,
"Agent or trustee for the above named stockholders.
"A. L. ISRAEL,
"B. F. PEARMAN."

At the time of the signing of the contract Hall delivered to Israel and Pearman the minute book of the corporation but retained the corporate seal and stock book. Immediately thereafter Israel and Pearman began mining operations as the Moyers Coal Corporation, and agreed between themselves upon a distribution of the stock, allotting to each an equal number of shares, but no stock was actually issued.

The record clearly indicates that Israel and Pearman had only a hazy knowledge of the conduct of corporate business and that they were men of very limited means. In order to operate the business it became necessary to secure credit. In their corporate capacity they applied to I. C. Boyd, the owner of a general store, for credit, and Boyd furnished the corporation supplies amounting to $3,860.41. At the time credit was extended by Boyd he was shown the contract entered into between Hall, agent, and Israel and Pearman, and was fully aware of the fact that the mining operation was being conducted as the Moyers Coal Corporation, and the credit was therefore extended to the corporation.

Upon the alleged failure of the corporation to meet its payments, a deed of trust was executed by Moyers Coal Corporation to secure Boyd in the sum of $2,576.37. The execution of this deed of trust was ratified at a meeting of the alleged stockholders and directors held in December, 1927.

Again, in September, 1928, a meeting of the alleged directors was held and the following resolution was adopted:

"The following business was brought before the meeting, viz: It has just been brought to the attention of the directors by B. F. Pearman, president of the Moyers Coal Corporation, that the corporation is indebted to I. C. Boyd, of Drill, in the sum of $1,294.04 for merchandise and supplies furnished to the corporation and for orders paid by the said Boyd to our men when working. Upon motion duly made and carried the president of our corporation, Mr. B. F. Pearman, is hereby authorized and empowered to go before the Circuit Court at Lebanon, Va., which is now in session, and confess judgment upon the amount due to the said I. C. Boyd which is $1,294.04.

"There being no further business to come before the meet-

ing and upon motion duly made and carried the meeting was adjourned."

Pursuant to the above resolution, judgment was obtained in the circuit court.

Default having been made in the payment of the note secured by the deed of trust, a sale of the property was had thereunder and Boyd became the purchaser thereof. Thereupon, this suit was instituted by the appellant to annul both the deed of conveyance from Whited, trustee, to Boyd, and the judgment obtained by Boyd against the Moyers Coal Corporation. The lower court decreed that appellant was not entitled to the relief sought and dismissed the bill. From that decree this appeal was allowed.

Appellant rests its case on the following contentions: (1) The contract in question was an executory contract; (2) there was never any delivery of the stock to Israel and Pearman; (3) there was never any transfer of the stock on the stock book of the corporation; (4) Israel and Pearman were not directors of the corporation and therefore had no authority to bind the corporation; (5) appellants did nothing to mislead appellees into extending credit to the corporation.

Among other defenses, appellees relied upon the doctrine of equitable estoppel, urging in support thereof the acts and conduct of appellants in permitting Israel and Pearman to operate as the Moyers Coal Corporation and thus secure credit which enured to the benefit of Hall and other stockholders.

Another contention made on behalf of appellees is that the contract of February 1st is an executed contract; that the stock of the corporation was delivered to them by Hall, agent, and by them re-delivered to Hall, agent, as collateral security to secure the purchase money notes.

In our view of the case it becomes unnecessary to enter upon a minute discussion of the first four issues raised by

appellant. The decree of the lower court indicates that the decision was based upon the correctness of appellee's contention. In that conclusion we concur. The record discloses that from the very inception of the transaction Hall, acting as agent for the stockholders, treated the contract as a sale of the corporate interests. Without question, he received numerous checks signed "Moyers Coal Corporation, by A. L. Israel, secretary," and credited the proceeds on the notes of Israel and Pearman. When Israel and Pearman became lax in meeting their payments, Hall, acting as agent, directed them in writing to execute a deed of trust upon the corporate property and discharge the indebtedness. In response to a letter from the State Corporation Commission directed to Moyers Coal Corporation, calling for a report of its corporate actions, Hall directed that the report be made by Israel and Pearman. The record further discloses that subsequent to the date of the contract, on communicating with the corporation, the Corporation Commission directed its letters to "Moyers Coal Corporation, B. F. Pearman, President, Drill, Virginia."

On September 15, 1927, H. B. Thompson, a stockholder, director and secretary, wrote this letter:

"MOYERS COAL CORPORATION.

"GENTLEMEN: Enclosed form to report on your stockholders meeting. Fill out and mail to Richmond.

"Hope you are doing well and making lots of money. * * * "

Again, on August 2, 1928, Thompson wrote the following:

"MOYERS COAL CORPORATION.

"GENTLEMEN: Your letter received, and in reply will say, I don't think you could make any arrangements with the banks here to take care of the notes.

"But if you can arrange with your banks at Honaker, Va. to make you a loan—we will take off $1,000.00, but under-

stand this offer is only for thirty days, from this date, now if you can do this the amount we are taking off would pay interest on the money for some time so let me hear from you soon.

"Yours truly,

"H. B. THOMPSON."

It also appears in the record that no meeting of Moyers Coal Corporation (meaning Hall and associates) was held subsequent to the contract of February 1, 1929.

From the cross-examination of Hall this illuminating colloquy took place:

"Q. I believe you say you wrote it? (the contract).

"A. Yes, sir; I think so.

"Q. I suppose you made it speak the substance of your agreement with these parties, didn't you?

"A. That was what I aimed to do. Of course, it might not do it.

"Q. I see that it recites that of the balance of this purchase price represented by the fifty-three non-interest, negotiable, collateral notes of even date herewith, executed by the said A. L. Israel and B. F. Pearman, parties of the second part, to the order of J. S. Hall, agent or trustee, payable at the Flat Top National Bank of Bluefield, West Virginia, which said notes are secured by the above mentioned stock, by the certificates of stock being attached to the above series of notes, and to be held by the said J. S. Hall as such as security. What stock is there referred to?

"A. The stock that is the certificates of stock that have been referred to heretofore.

"Q. It is there recited that the stock is to be held as security for these notes representing a balance of the purchase price. Whose notes was it that this stock was to be held by you as security for?

"A. A. L. Israel and B. F. Pearman's notes.

"Q. The notes of A. L. Israel and B. F. Pearman?

"A. Yes, sir.

"Q. Who was putting up this stock as security for these notes?

"A. The stockholders, I suppose, of the Moyers Coal Corporation, as they were the owners of it, to be delivered when paid for to A. L. Israel and B. F. Pearman.

"Q. Who was supposed to be the holder of these notes referred to?

"A. J. S. Hall, as agent for the stockholders.

"Q. So that the stockholders, under your understanding, were to put up their own stock to secure their notes which they held against other parties under the contract which you wrote?

"A. Well, I don't know how you would construe that.

"Q. How did you construe it—you wrote it.

"A. I understood it was to be held until the notes were paid off and then it was to be delivered to A. L. Israel and B. F. Pearman.

"Q. Well, what does this contract mean, the provision I have read here, where it recites that this stock is put up as security for these notes?

"A. It means just what it says, so far as I can understand. Legally, I don't know whether I got the right idea of it or not. I am not an attorney."

In our opinion the record is replete with facts and circumstances which show conclusively that Hall, agent, and Thompson, secretary, knew that Israel and Pearman were operating as Moyers Coal Corporation.

■ That the doctrine of estoppel applies to a corporation as well as to an individual is incontrovertible.

Boyd, in his deposition, states positively that he put forth reasonable efforts to ascertain the true status of affairs;

that credit was extended not to Israel but to the corporation. Hall knew that Israel and Pearman were men of limited means and it is a fair assumption that he knew that appellee or some one else was extending credit in order for them to operate the mine to meet the payments which they made on their stock purchase.

In *Chesapeake & Ohio R. Co.* v. *Walker*, 100 Va. 69, 91, 40 S. E. 633, 641, 914, Judge Keith adopts the rule laid down in 4 Amer. & Eng. Decs. in Eq. 258. There we read:

■ "The general rule of equitable estoppel, or, as it is frequently called, estoppel *in pais*, is that when a person, by his statements, conduct, action, behavior, concealment, or even silence, has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statements or conduct, if the latter has so far changed his position that he would be injured thereby."

Whether the case at bar falls within the doctrine of equitable estoppel or whether the contention of appellant that Israel and Pearman failed to strictly comply with the statute governing corporations is sound, seems to us immaterial. In our opinion the instant case is ruled by this doctrine approved in *Chesapeake & Ohio R. Co.* v. *Walker, supra:*

■ "There are undoubtedly cases where a party may be concluded from asserting his original rights to property in consequence of his acts or conduct, in which the presence of fraud, actual or constructive, is wanting; as, where one of two innocent parties must suffer from the negligence of another, he, through whose agency the negligence was occasioned, will be held to bear the loss; and where one

received the fruits of a transaction, he is not permitted to deny its validity whilst retaining its benefits. But such cases are generally referable to other principles than that of equitable estoppel, although the same result is produced. Thus the first case here mentioned is the affixing of liability upon the party who from negligence indirectly occasioned the injury, and the second is the application of the doctrine of ratification or election." *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326, 336, 23 L. Ed. 927.

The decree must, therefore, be affirmed.

*Affirmed.*